IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2015


STATE OF TENNESSEE v. KEVIN E. TRENT


Appeal from the Criminal Court for Claiborne County
No. 2014CR1918     John McAfee, Judge by Interchange

_____


No. E2015-00753-CCA-R3-CD – Filed July 21, 2016
_____


The defendant, Kevin E. Trent, appeals the trial court's denial of his request for alternative sentencing. Pursuant to a plea agreement, the defendant pled guilty to vehicular homicide by intoxication, a Class B felony. The agreement specified an eight-year sentence with the manner of service to be determined by the trial court. Following a sentencing hearing, the court ordered that the sentence be served in the Tennessee Department of Correction. On appeal, the defendant argues that the decision was error because the trial court incorrectly concluded that confinement was necessary to avoid depreciating the seriousness of the offense. Following review of the record and the evidence before us, we conclude that the trial court abused its discretion in requiring full confinement and reverse the sentence consistent with this opinion.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**


JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., J., joined. ROGER A. PAGE, J., not participating.

Robert Scott, Assistant District Public Defender, for the Appellant, Kevin E. Trent.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Jared Effler, District Attorney General; and Graham Wilson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background and Procedural History

The defendant's conviction in this case arose from his involvement in an automobile crash that resulted in the death of the forty-year-old victim, a mother of four children. Pursuant to our sua sponte order, the record has been supplemented with the transcript of the guilty plea hearing and the presentence report. According to the presentence report, the defendant was driving under the influence of oxycontin and alprazolam on May 3, 2012, and he crossed the center line of the highway, striking the car of the victim, Karen Freeman.

A grand jury indicted the defendant for vehicular homicide by intoxication and driving under the influence ("DUI"). Thereafter he pled guilty to the vehicular homicide charge, and the DUI charge was dismissed. The record indicates that the defendant stipulated, despite a lack of memory, that his vehicle collided with the victim's and that the State had proof that he was intoxicated because the level of oxycodone in his system was above therapeutic levels. The defendant also stipulated that his intoxication led to the accident and the victim's death based upon the proof that the State had. Pursuant to an agreement, he received an eight-year sentence as a Range I offender, but the manner of service was left to the discretion of the trial court. A sentencing hearing was held, at which time the victim's mother, the manager of a local convenience store, the defendant's friend, the defendant's father, and the defendant himself testified.

The victim's mother testified that her daughter was traveling to school on the afternoon of the accident in order to pick up two of her four children. After receiving a call from the school that the children had not been picked up, the family learned that the victim had been involved in a serious accident. The victim received critical injuries in the wreck and was hospitalized for over two months. Afterwards, the victim was transferred to a nursing home, where she remained for a year and a half before dying of injuries caused by the accident. According to her mother, the victim lost a finger, had rods inserted in her legs, lost the use of her hands, had a tracheotomy and a feeding tube, suffered from a brain injury, and was unable to speak. The victim had to be bathed and turned in her bed, as she was unable to perform these actions on her own.

The next witness, Ms. Peggy Holt, was the manager of the Springdale Pic N Pay, a store that the defendant frequented. She testified that she had seen the defendant drive to the store multiple times and that he usually sent someone in for his purchases. On the day of the accident, Ms. Holt witnessed the defendant drive away, almost hitting the canopy pole in front of the store.

Ms. Holt testified that because of the defendant's disability, she had approached the defendant in his truck on prior occasions and noted that he was not attentive and had slow, slurred speech. She said that she did not see any sort of handicap accommodations inside the defendant's truck.

Through the testimony of the three defense witnesses, Rick Leonard, Tim Trent, and the defendant, it was established that the defendant had been involved in a prior accident in June of 2005. In that accident, the defendant was traveling on a motorcycle when an intoxicated driver pulled out in front of him. The defendant and his motorcycle slammed into the driver's side of the car. As a result of the accident, the defendant lost his left leg and both arms from the elbow down. He spent multiple months in the hospital and a rehabilitation facility. He was prescribed oxycodone and Xanax during this period. After the accident and treatment, he continued to take those medications. The motorcycle accident was determined to be the fault of both the intoxicated driver and the defendant's speed.

Prior to the motorcycle accident, the defendant had graduated from high school and was working forty hours per week, in addition to mowing thirty to forty yards. It was also established that that defendant had no additional interaction with the law and no arrests until his arrest in the instant case. The defendant, his friend, and his father all testified that the defendant very rarely drank alcohol, and the defendant testified that he tried marijuana only one time and did not care for it.

After the motorcycle accident and subsequent treatment, the defendant stayed with his father because he was unable to take care of his personal needs. He was also unable to continue his employment and began receiving Social Security disability benefits. However, he was able to continue mowing some lawns on his zero turn mower and to drive his vehicle again beginning in December of 2005. According to both the defendant and his father, after the motorcycle accident, they contacted the driver's license agency and were informed that the defendant did not need a restricted license because of the loss of his limbs unless special adaptations were required for him to be able to drive his vehicle. According to the witnesses, the defendant was able to drive without such adaptations. He had a prosthesis but did not utilize it, as it was painful. The defendant's father testified that he often rode with the defendant and felt comfortable doing so, even stating that the defendant was a better driver than he himself. Mr. Leonard had witnessed the defendant driving, but he did not ride with him because the defendant's impairment made him uncomfortable. The defendant had not been involved in any other motor vehicle accidents from December 2005 until May of 2012, when the accident that is the subject of this case occurred.

3

Both Mr. Leonard and the defendant's father testified that the defendant was a "normal" person who cared about people and who liked to hunt and fish. His father testified that the defendant was a hard worker and tried to take care of himself as much as possible, even after the motorcycle accident. He learned to adapt to his limitations and was able to feed himself, get in and out of his wheelchair, get his wheelchair in and out of the truck by himself, and could still hunt and fish with adaptations made to his gun. Mr. Leonard and the defendant's father were both aware that the defendant took prescription pain medications, but each stated that the defendant's speech was not normally slurred. His father noted that if the defendant was using smokeless tobacco, he was sometimes difficult to understand. The defendant's father also stated he had no concerns about the defendant's abusing his pain medication. Each man also noted that the defendant felt great remorse over his involvement in the death of the victim.

The defendant testified that he had no memory of the accident whatsoever. He also could not recall the few weeks prior to or after the accident, stating he woke up in the hospital with no idea as to what had happened.

With regard to his pain medication, the defendant testified that his prescribed dosage had increased over the years following the motorcycle accident. He testified that he spoke with his doctor about the side effects of the medications, but he could not recall the doctor's name. He stated that he currently received his medications from a pain management clinic. With regard to the usage of his medications, the defendant testified that he normally took them as prescribed. However, he acknowledged that, if he were hurting very badly after a particularly active day, he would take an extra pill. He stated that he only took an extra pill when he was at home, not while he was driving. While acknowledging that the State had tested his blood after the accident and that the results indicated his levels were above therapeutic levels, he had no recollection of how or why this occurred. He further testified that, despite his stipulation, he could not actually say that the medication he was taking had caused the accident. He stated that he pled guilty as such only because the State had a report which stated that his levels were elevated.

The defendant also testified that he had driven a vehicle three times after the wreck that claimed the victim's life. He stated that he had driven with the same limitations for a number of years, and he actually still believed himself to be a safe driver. He acknowledged, however, that if he were given an alternative sentence, he would no longer be allowed to drive.

After the evidence was presented, the State vigorously argued for the application of two enhancement factors. The first was prior criminal behavior, which the State argued was established by the defendant's driving three times after the wreck in this case while on medications, smoking marijuana one time, reckless driving based upon his admission that his speeding was partially to blame for his motorcycle accident, and his

4

drawing disability and continuing to mow yards. *See* T.C.A. 40-35-114(1) (2010). The second factor which the State asserted applied was number ten, no hesitation about committing a crime when the risk to human life was high; this factor was based upon the defendant driving while on medications with no accommodations for his disability. *See* T.C.A. 40-35-114(10). The trial court found that only factor ten had been established. The court also concluded that the sentence should be served in incarceration in order to avoid depreciating the seriousness of the offense. The defendant has now timely appealed that decision.

### Analysis

On appeal, the defendant contends that the trial court erred in ordering that he serve his sentence in confinement, specifically arguing that the court erred in ordering confinement based upon the fact that confinement was necessary to avoid depreciating the seriousness of the offense. Contrarily, the State argues that the record does support the trial court's finding. In support of its argument, the State relies upon the fact that: (1) the defendant had been in a previous serious accident and personally knew the dangers posed by intoxicated drivers; (2) despite his contribution to causing the motorcycle accident, the defendant continued to drive under the influence of an intoxicant; and (3) the defendant was endangering more than just the victim on the day of the crash. According to the State, the trial court was correct in concluding that the circumstances surrounding the crash and its aftermath were sufficient to impose confinement.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-

5

10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

An offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. T.C.A. § 40-35-303(a). While the trial court is required to automatically consider probation as a sentencing option pursuant to Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. *Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). Tennessee courts have held that if the seriousness of the offense forms the basis for the denial of alternative sentencing, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Bottoms,* 87 S.W.3d 95, 103 (Tenn. Crim. App. 2001) (quoting *State v. Hartley,* 818 S.W.2d 370, 374–75 (Tenn. Crim. App. 1991)); *see also State v. Trotter,* 201 S.W.3d 651, 654 (Tenn. 2006). Moreover, a trial court may not consider factors that constitute elements of the offense in determining whether the circumstances of an offense satisfy this standard. *See*

6

*State v. Housewright,* 982 S.W.2d 354, 358 (Tenn. Crim. App. 1997) (citing *State v. Bingham,* 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), *overruled on other grounds by Hooper,* 910 S.W.3d at 10).

A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

In ordering that the defendant serve his sentence in the Department of Correction and denying him any form of alternative sentencing, the trial court made the following comments on the record:

. . . Well, let me just go through and summarize just a little bit.

Of course, [the victim] passed away, and her mother testified here today, a very sweet lady, and got a - - got a pretty good picture and image of [the victim], and I looked at the picture and the photographs. She's a very beautiful lady, four children, just appeared to be full of life.

We do know that at the time of the accident, she was severely injured, was at UT approximately six weeks, she was in the nursing home for a year and a half thereafter and passed away on October 9, 2013, severe brain injuries, she couldn't talk, she couldn't walk, she couldn't feed herself, she couldn't breathe on her own, obviously very severe injuries and - - and undoubtedly suffered at the last part - - last few days of her life - - the last few months or weeks.

Peggy Holt testified. She said that she - -  and I think that if I remember this correctly, six, seven times that she knew of[,] the defendant on those occasions, he appeared to have slurred speech because she'd have to go out to the vehicle and to get money because of his handicap. On the day of the accident a little - - at lunch or a little after lunch, she said she witnessed him there at the gas station and he nearly struck the canopy pole that was there. The accident occurred, we know, and it was agreed to when I asked the trooper a moment ago about 3:05 that afternoon.

Mr. Leonard testified which is a friend of the defendant here in this case. They had been friends almost six or seven years, and - - but the one note that I would say, he said he was a really good person, a kind person,

7

and again, I'm summarizing and - - but he did say - -  and I made a note to the fact that he wouldn't ride with him because it appeared to be a dangerous situation, and he was very candid about his handicap as the reason why he didn't do that.

Mr. Trent, the defendant's father, testified.  Seemed to be a very genuine man and should - - should be given credit, he stuck with his son for all these years after the motorcycle accident where he lost his limbs, made modifications to his [gun] so he could hunt.  Apparently, hunting is an important part of their life, and made modifications.  And I think the District Attorney has noted that there were never any modifications made to the vehicle as far as his ability to drive, but they appear to be very extensive modifications to hunt, even to dove hunt.  I understand with other types of hunting but with dove hunting, you have to be moving with a shotgun and so, they made accommodations.  It appeared even from the - - even from his dad's testimony that his son was a very independent person, he said, and continued to mow, not as much, I think, prior - - and after the motorcycle accident, and we do know that he was driving and owned a three-quarter ton Chevy pickup, four doors.  And I was somewhat - - I was somewhat - - I think he was living back and forth - - the defendant was living back and forth – Cocke County and Claiborne County.  He was living in Claiborne County at some - - at some times, and the accident, of course, occurred there in this county.

Defendant testified, says he can't remember a whole lot that happened after the accident.  He did admit that he has taken excessive - - greater amounts of his medication that's above what his prescription is for.  He seemed - - he can't - - he seemed to not be able to remember his physician which is a pain clinic which is in Bulls Gap, and he says he attends a - - which has nothing to do with this maybe today, but Skyview in Knoxville which is another pain clinic.  Said he continued to drive three times at least after this accident.  And I think he made it very clear that - - I think even through his testimony, it's obvious that he seems to think he's a very independent person, he didn't need accommodations for anything.  He indicated that he's in severe pain and has to take these medications to function at times, but he continued to drive.

I believe enhancement factor ten applies in this case based upon the two cases that were submitted to the Court.  Because of that pain medication, because of what he was doing - -  and sometimes that can be somewhat dangerous, especially with people who have been independent.  It appears that the defendant worked quite a bit, was a hard worker prior to

his motorcycle accident and wanted to continue to do so. I think his dad indicated that. He dad said he wanted to try to live his life. And sometimes that's a dangerous situation and especially if you're taking medications and you want to drive and you want to continue to operate a vehicle. I found it somewhat disconcert[t]ing that the defendant knew very little about any kind of limitations on his medicine. He sort of indicated or testified that - - that he could operate a vehicle as long as - - I guess as long as he was - - with taking his medicine as prescribed, but he also told me that he took excess amounts of those prescribed medications. He says he remembers the label saying it may cause drowsiness.

This obviously is very serious, and I - - and I asked about a stipulation of fact a moment ago. Of course, we read in the indictment, and I don't know how the accident occurred other than the fact of what's in the indictment and what he agreed to in the stipulation. This is a serious situation. The defendant should be commended for not having a prior criminal history and dealing with the motorcycle accident. I concur with his attorney there, he showed a lot of resilience after the - - after the motorcycle accident. But, this situation in and of itself, he should not have been operating that vehicle that day. He pled guilty to that. If he had not been in that vehicle that day, [the victim] would still be alive. He made a decision to take excess amount of his pain killers and operate a vehicle that day and killed another human being. He made that decision – an unfortunate decision, but he made that decision. That being the case, the Court is going to remand the defendant to Tennessee Department of Corrections for eight years.

Although not specifically stated by the trial court as its reasoning, our reading of these findings leads us to conclude that the trial court based its decision to impose confinement solely upon the need to avoid depreciating the seriousness of the offense. Both the State and the defendant agree with that conclusion, and we note at this juncture that none of the other possible circumstances upon which to deny alternative sentencing are present in this case. With regard to depreciating the seriousness of the offense, we must conclude that the record is devoid of any specific findings that the offense "as committed" was "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree." *Bottoms*, 87 S.W.3d at 103 (citations omitted). We note that the trial court, despite the relaxed standard of *Bise*, is still required to place on the record its reasons for imposing the specific sentence. *See Shannon Ann Maness and Darlyn Wayne Maness*, No. W2012-02655-CCA-R3-CD, 2014 WL 350429, at * 16-17 (Tenn. Crim. App. Jan. 23, 2014); *see also State v. Robert Joseph Hart*, No. W2011-02735-CCA-R3-CD, 2013 WL 5422801, *10 (Tenn. Crim. App. Sept. 27, 2013) (Tipton, P.J., concurring and dissenting) (noting that he did not believe "our

supreme court intended in *Bise* or *Caudle* to do away, in wholesale fashion, with Tennessee jurisprudence developed over the last thirty years upon which the Sentencing Act is based and in which the Act's previsions are interpreted."). As such, the trial court should have placed findings on the record if it concluded that the offense was "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree." Nonetheless, as addressed below, the record fails to establish any of those findings.

Turning to our review of this case, we again note that we are aware of the fact that trial courts have been given great latitude in sentencing determinations. Indeed, this court is constrained to uphold sentencing determinations made by a trial court that are "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Despite that great latitude afforded, we are unable to conclude that the record supports that this sentence is in compliance with the purposes of the sentencing act. The record is simply devoid of the facts necessary to establish such. For instance, there are no facts in the record as to how the wreck itself occurred, *i.e.*, was the defendant speeding, was he driving recklessly prior to the accident, did he endanger others, was there another contributing factor to the wreck, the setting of the wreck, or the amount of medication which the defendant consumed. *Contra State v. Micah Alexander Cater*, No. E2014-01322-CCA-R3-CD (Tenn. Crim. App. Sept. 28, 2015) (excessive speed and the amount of alcohol were sufficient to establish circumstances of the offense horrifying); *State v. James R. Bristow*, No. M2014-00595-CCA-R3-CD (Tenn. Crim. App. Mar. 17, 2015). By simply relying upon the indictment and introducing no proof with regard to circumstances of the wreck, the State has shown only that the defendant, while taking prescribed pain medication, was in an automobile crash, which resulted in the death of the victim. The State failed to even introduce the actual level of the defendant's intoxication. We are left to wonder if the defendant had taken one extra pill or ten.

The State argues that the defendant had a prior history of criminal behavior. The State contends that the defendant drove three times after the wreck, but the State did not introduce any evidence that the defendant was impaired while driving or that the driving occurred after the defendant pled guilty. The fact that the defendant smoked marijuana one time years earlier should not have a substantial impact in the review of this sentencing decision. The State's argument that the defendant drove recklessly based on his speed during the motorcycle wreck was mere conjecture that was not supported by evidence. The defendant admitted that his speed was partially to blame for the motorcycle accident, but there was no evidence that he drove recklessly. There was also no evidence that the defendant was anything other than a productive citizen in spite of his limitations in regards to mowing yards while receiving disability checks. The State

10

presented no evidence that it was illegal for the defendant to receive disability checks and mow yards.

The trial court should not have considered the defendant's driving three times while taking medication after the wreck without evidence of the effect of the medications. While the defendant testified that the label may have indicated that the medication caused drowsiness, the State did not introduce this label or put on any other proof illustrating the effects of the medication. The trial court also should not have considered the defendant a reckless driver based on the motorcycle accident without proof of his speed during the wreck. Finally, the trial court should not have considered the defendant's receiving disability checks while mowing yards without evidence that such behavior was illegal. The State raised the issue of the defendant's illegal conduct only by innuendo, which is an insufficient basis to support a finding by the trial court.

These omissions in the State's proof are made more critical because the trial court based its determination only upon the need to avoid depreciating the seriousness of the offense. As noted earlier, in order to support that decision, the record must establish that the circumstances of the offense "as committed" were "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree." *Bottoms*, 87 S.W.3d at 103 (citations omitted). There is no evidence to establish that here.

The defendant pled guilty to vehicular homicide by intoxication. Two elements of the offense are the reckless killing of another by operation of a motor vehicle and that the killing was the result of the defendant's intoxication. T.C.A. § 39-13-213(a)(2) (2014). Those elements cannot be the basis for further or stricter punishment. *Housewright*, 982 S.W.2d at 358 (citations omitted). As there are no other facts in the record, we are left only with the consideration that the defendant chose to drive with his stated disabilities while taking his prescribed medications in some quantity above the therapeutic level. That decision, while unlawful, certainly does not rise to the level needed to deny alternative sentencing solely upon the basis of depreciating the seriousness of the offense. If that were true, all defendants would be denied alternative sentencing. Furthermore, the defendant had a valid driver's license, had driven with the disability for approximately seven years with no accidents, and had been taking the same medications for the entire period.

Despite that it was an element of the offense, the trial court clearly gave great weight in its determination to the fact that the defendant was taking pain medication and driving. That act in and of itself is not illegal or "shocking." There are warnings on the bottles that advise "caution" while operating machinery. The defendant had been taking the same medications since 2005 and specifically testified that he had discussed side effects with his physician. We likewise point out that the trial court placed great weight

11

on the defendant's admission that he had taken more than the prescribed dosage of his medication. However, what the court does not seem to consider is that the defendant specifically testified that he only took "an extra pill" at night and that he never did so when he was driving. Moreover, counsel for the defendant indicated that the report indicated that the defendant's levels were only "slightly" elevated. Again, the State failed to introduce proof through its report as to what the levels actually were. The defendant, having no recollection of the event, only agreed to plead guilty based upon that report.

Additionally, both the trial court and the State also seem to be seeking to penalize the defendant for not making modifications to his vehicle when he did make modifications to his shotgun. That fact does not rise to the level necessary for criminal conduct when considering that the defendant had a valid driver's license to drive on the roadways of Tennessee. According to both the defendant and his father, whose testimony the trial court appeared to accredit, they inquired with the appropriate department following the motorcycle accident and were told no special restrictions would be necessary unless modifications were made to the vehicle. Although the court finds fault with the fact that no modifications were made, the record does not support that they were necessary in the defendant's case. What both the court and the State fail to consider is the fact that the defendant drove for several years after his motorcycle accident and the loss of his limbs with no modifications or accidents.

Looking to the required findings, which must be made if the denial of alternative sentencing is based solely on depreciating the seriousness of the offense, we conclude the record does not support the trial court's findings. While we in no way mean to minimize the tragedy to the victim and her family, there is simply nothing in the record which leads to the conclusion that the circumstances or events which lead to this wreck "as committed" were "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree." *Bottoms*, 87 S.W.3d at 103 (citations omitted).

Again, the events in question here had a devastating impact on the victim and her family. By our decision in this case, we in no way mean to imply otherwise. However, even given the great latitude to trial courts in sentencing determinations, the record simply does not support the trial court's conclusion. The proof in the record with regard to the circumstances of the offense simply does not rise to the level necessary to support the sentencing decision based solely upon the need to avoid depreciating the seriousness of the offense. As a result, the record does not support the court's findings. We are unable to afford the court's sentencing determinations a presumption of reasonableness and conclude the trial court abused its discretion by denying the defendant's request for probation.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is reversed, and the case is remanded for the defendant to be placed on probation for the remainder of his sentence upon conditions to be determined by the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

13